UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

AUSTIN WORKS, MICHAEL LYNCH,                  CIVIL ACTION NO. 21cv3567
CARLTON GRIGSBY, MACK GORDON,
CHAD HOLCOMB, CHARLES TILLMAN,
SOLOMON WILLIAMS, JAY STEVEN SMITH,
TIMOTHY RANDELS, FREDDIE OLIVEAUX,            JUDGE HICKS
JASON ALBRITTON, and SHAGREY JONES

VERSUS
                                              MAGISTRATE JUDGE
FLOWERS FOODS, INC. and FLOWERS               WHITEHURST
BAKING COMPANY OF TYLER, LLC

_____

SOLOMON WILLIAMS' OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

/s/ Steven G. Durio
STEVEN G. DURIO (#05230)
D. PATRICK KEATING (#14417)
RANDY M. GUIDRY (#26909)
LAUREN ASHLEY NOEL (#37243)
**Durio, McGoffin, Stagg & Guidry**
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, LA  70505-1308
Phone: (337) 233-0300
Fax:    (337) 233-0694
Email:  durio@dmsfirm.com
        rick@dmsfirm.com
        randy@dmsfirm.com
        lauren@dmsfirm.com

TRAVIS J. BROUSSARD (#33036)
130 South Audubon Boulevard, Suite 109
Post Office Box 82238
Lafayette, LA 70598-2238
Phone:  (337) 316-8135
Fax:    (337) 233-9095
Email:  travis.broussard@live.com

RYAN M. GOUDELOCKE (#30525)
130 South Audubon Blvd., Suite 105
Lafayette, LA  70503
Phone:  (337) 345-1985
Fax:    (337) 233-9095
Email:  ryan@goudelocke.law

THOMAS M. HAYES, IV (#28600)
**Hayes, Harkey, Smith & Cascio, L.L.P.**
2811 Kilpatrick Boulevard (71201)
Post Office Box 8032
Monroe, LA 71211-8032
Phone: (318) 387-2422
Fax:    (318) 388-5809
Email:  tommy@hhsclaw.com

ATTORNEYS FOR PLAINTIFF,
SOLOMON WILLIAMS

i

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

EXHIBIT LIST ...................................................................**Error! Bookmark not defined.**

I.      SUMMARY OF CONTESTED FACTS ....................................................................... 1

II.     SUMMARY JUDGMENT ON WILLIAMS' FLSA  AND LWPA CLAIMS IS
INAPPROPRIATE ........................................................................................................ 3

FACTS ................................................................................................................................. 3

    A.      Williams Is Not Covered by the MCA Exemption ...................................................... 3

        i.       The FLSA and the MCA have different definitions of interstate commerce. .......... 4

        ii.      Williams could not be reasonably expected to make interstate runs. ...................... 8

        iii.     Flowers does not apply the MCA to its deliverymen. ............................................. 10

        iv.      Williams is also excluded from MCA jurisdiction under the TCA exception. ...... 11

        v.       Flowers disregards the consistent intent and purpose of both the MCA and the
        FLSA. ..................................................................................................................... 12

    B.      Williams Is Not Covered by the Outside Sales Exception ........................................ 12

    C.      Williams Was Entitled to Protection Under the "Economic Realities" Test as an FLSA
    Employee .................................................................................................................... 14

        1)      Degree of Control. .................................................................................................. 17

        2)      Relative Investments. ............................................................................................. 20

        3)      Worker's Opportunity for Profit. ........................................................................... 22

        4)      Skill and Initiative. ................................................................................................ 23

        5)      Permanency of the Relationship. ........................................................................... 24

    D.      Summary Judgment Should Be Denied on Williams' LWPA claim. ......................... 25

        i.       Flowers Assessed Fines In Violation of the LWPA. .............................................. 25

        ii.      Williams' LWPA Fine Claims Are Not Time Barred. ........................................... 27

III.    CONCLUSION.............................................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Aikens v. Warrior Energy Services*, 2015 WL 1221255 (S.D. Tex. 2015)................................. 11

*Amaya v. NOYPI Movers, L.L.C.,* 741 F. App'x 203, 204 (5th Cir. 2018). ............................... 3, 4

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). .................................................................. 3

*Baird v. Wagoner Transp. Co.*, 425 F.2d 407 (6th Cir. 1970)............................................. 6, 8, 10

*Beard v. Summit Institute of Pulmonary Medicine,* 707 So. 2d 1238 (La. 1998) at 1237 ........... 26

*Boutell v. Walling*, 327 U.S. 463 ...................................................................................................... 4

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir. 1987) ........................................ 17

*Burfield v. Brown,* 51 F.3d 583, 588 (5th Cir. 1995)....................................................................... 3

*Carley v. Crest Pumping Techs., L.L.C.,* 890 F.3d 575, 579 (5th Cir. 2018) ......................... 11, 12

*Carrell v. Sunland Construction, Inc.,* 998 F.2d 330, 334 (5th Cir. 1993)................................... 20

*Castillo v. St. Croix Basic Servs., Inc.,* 72 V.I. 528, 533, 2020 VI SUPER 35 ........................... 28

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ....................................................................... 3

*Duckworth v. Louisiana Farm Bureau Mut. Ins. Co.*, 11–2835, p. 14 (La.11/2/12), 125 So.3d
1057.......................................................................................................................................... 28

*Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142, 200 L.Ed.2d 43 (2018) ................. 13

*Fraser v. Patrick O'Connor & Assocs., L.P.,* 954 F.3d 742, 748 (5th Cir. 2020) ......................... 7

*Galbreath v. Gulf Oil*, 413 F.2d 941 (5th Cir. 1969)....................................................................... 6

*Gall v. Greenpath International*, 334 So. 2d. 399 (La. App 4th Cir. 2021) ................................... 26

*Glover v. Diving Services International, Inc*., 577 So. 2d 1103 at 1108. (La. App 1st Cir. 1991)26

*Goldberg v. Faber Industries*,' 291 F. 2d 232 (7th Cir. 1961) ....................................................... 4

*Harney v. Louisiana Citizens Prop. Ins. Co*., 12-177 (La. App. 5 Cir. 11/27/12), 106 So. 3d 193
....................................................................................................................................................... 28

*Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020) .............................. 17

*Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008).................. 15, 16, 17, 22, 23, 24

*Johnson v. Heckmann Water Resources (CVR), Inc.,* 758 F.3d 627 at 630 (USCA 5 Cir. 7/14/14)
....................................................................................................................................................... 15

*Leprettre v. RCS, LLC,* 206 So. 3rd 1215 (La. App. 3rd Cir., 2016)............................................ 26

*Levinson v. Spector Motor Service*, 330 U.S. 649 ....................................................................... 4, 5

*Louviere v. Shell Oil Co*., 440 So.2d 93 (La.1983)....................................................................... 27

*McCall v. Louisiana Right of Way Servs., Inc.,* 2020-351 (La. App. 3 Cir. 12/16/20), 310 So. 3d
248........................................................................................................................................... 27

*McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989) ................................................ 15

*Moore, et al v. Performance Pressure Pumping, et al,* 5:15-cv-432 c/w 5:15-cv-346 (W.D. Tex.
2017). ...................................................................................................................................... 11

*Morgan v. Family Dollar Stores, Inc*., 551 F.3d 1233, 1259 (11th Cir. 2008)............................ 27

*Morris v. McComb*, 332 U.S. 422, 436 (1947) ..................................................................... 4, 5, 12

*Nat' l Ass'n of Gov't Emps.  v. City Pub. Serv. Bd.*, 40 F.3d 698, 712-13 (5th Cir. 1994). ........... 3

*Nini v. Sanford Brothers, Inc*., 276 So.2d 262 (La.1973) ............................................................ 27

*Parker v. Southern American Insurance Co*., 590 So.2d 55 (La.1991)........................................ 27

*Parrish v. Premier,* 917 F.3d 369, 381 (5th Cir. 2019) ............................................................... 23

Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695 ................................................................... 4

*Quinn v. Louisiana Citizens Property Ins. Corp.,* 118 So. 3d 1011, 1020 (La. 2012) ................ 27

*Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490, 494 (W.D.N.C. 2016)
.................................................................................................................................... 10, 19, 24

*Richard, et al. v. Flowers Foods, Inc., et al.*, docket number 15-cv-2557 ........................ 2, 27, 28
*Roche v. S-3 Pump Serv., Inc.*, 154 F. Supp. 3d 441, 448 (W.D. Tex. 2016) ............................. 11
*Skidmore v. Swift*, 323 U.S. 134, 140, (1944) ................................................................................ 7
*Smith v. T–Mobile USA, Inc.*, 570 F.3d 1119, 1121 (9th Cir. 2009) ......................................... 27
*Southland Gasoline Co. v. Bayley*, 319 U.S. 44 ......................................................................... 4, 5
*Thibault v. Bellsouth Telecommunications, Inc.,* 612 F.3d 843, 847 (5th Cir. 2010) .................. 20
*Walling v. American Stores Co.*, 133 F. (2d) 840 (C.A. 3) .............................................................. 5
*Walling v. Jacksonville Paper Co.*, 317 U.S. 564 ........................................................................ 5, 6
*Walling v. Mutual Wholesale Food & Supply Co*., 141 F. (2d) 331 (C.A. 8) ................................. 5
*Wirtz v. Crystal Lake Crushed Stone Co.*, 327 F. 2d 455 (C.A. 7)) ............................................... 5

## Statutes

26 U.S.C. §3121 ....................................................................................................................... 16, 21
29 U.S.C. § 203 ..................................................................................................................... 5, 14, 27
49 U.S.C. 304 ................................................................................................................................... 4
Fed. R. Civ. P. 56(a) ........................................................................................................................ 3
La. C.C. art. 3494 ........................................................................................................................... 27
La. C.C. art. 3495 ........................................................................................................................... 27

## Other Authorities

Department of Labor, Wage & Hour Division, Fact Sheet # 19 (November 2009) available at
    http://www.dol.gov/whd/regs/compliance/whdfs19.pdf. ...................................................... 11
Ex parte No. MC–48 (71 M.C.C. 17, 29) ........................................................................................ 6
SAFETEA-LU Technical Corrections Act of 2008, PL110-244, June 6, 2008, 122Stst 1572,
    1620 ..................................................................................................................................... 11
United States Department of Labor, *Field Operations Handbook,* Chapter 24, at 24d02.
    (https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-24#B24a00) ..... 5, 6, 8

## Treatises

*Norman et al, Louisiana Employment Law* 2023 Edition §4:42 .................................................... 25

## Regulations

29 C.F.R. § 541.504 ....................................................................................................................... 12
29 C.F.R. § 541.700 ....................................................................................................................... 12
29 C.F.R. 782. .................................................................................................................................. 4
29 C.F.R. 782.1 ................................................................................................................................ 4
29 C.F.R. 782.2 ............................................................................................................................. 4, 5
29 C.F.R. 782.2. ............................................................................................................................... 4
29 C.F.R. 782.3. .......................................................................................................................... 4, 10
40 CFR § 201.1. ............................................................................................................................... 5

**EXHIBIT LIST – Solomon Williams**

| | |
|---|---|
| Exhibit 1 | Declaration of Solomon Williams |
| Exhibit 2 | Deposition Excerpt of Solomon Williams |
| Exhibit 3 | W-2 (SJW 000281) |
| Exhibit 4 | W-2 (SJW 000280) |
| Exhibit 5 | 10 Day Letter |
| Exhibit 6 | Deposition Excerpt of Ray Kirkland |
| Exhibit 7 | Deposition Excerpt of Dennis Lewis |
| Exhibit 8 | Distributor Agreement |
| Exhibit 9 | Lisa Hough Letter, Office of Governmental Affairs, U.S. DOT to Alanna Williams, dated February 19, 2016 |
| Exhibit 10 | Deposition Excerpt of Sam Houston |
| Exhibit 11 | *Rehberg, et al v. Flowers*, 162 F.Supp.3d 490 (W.D.N.C. 2016) |
| Exhibit 12 | 30(b)(6) Deposition Excerpt of Chuck Rich |
| Exhibit 13 | Excerpt Rich Deposition I and Rich Deposition II |
| Exhibit 14 | Deposition Excerpt of Jimmy Woodward |
| Exhibit 15 | Declaration of Dr. Shawn Kantor for Solomon Williams |
| Exhibit 16 | Deposition Excerpt of Dr. Shawn Kantor |
| Exhibit 17 | Declaration of Mack Gordon |
| Exhibit 18 | Declaration of Freddie Oliveaux |
| Exhibit 19 | Declaration of Jason Albritton |
| Exhibit 20 | Declaration of Shagrey Jones |
| Exhibit 21 | Declaration of Timothy Randels |
| Exhibit 22 | Declaration of Michael Lynch |
| Exhibit 23 | Declaration of Carlton Grigsby |
| Exhibit 24 | Declaration of James Chad Holcomb |
| Exhibit 25 | Declaration of Charles Steven Tillman |
| Exhibit 26 | Declaration of Jay Steven Smith |
| Exhibit 27 | Excerpt Flowers Form 10-K |

**MAY IT PLEASE THE COURT:**

Plaintiff, Solomon Williams ("Williams"), respectfully submits this Opposition to Flowers Foods, Inc. and Flowers Baking Company of Tyler, LLC's ("Flowers") Motion for Summary Judgment.[1] The motion should fail because movants have neither established that no genuine issues of material fact remain, nor that they are entitled to judgment as a matter of law.

## I.      SUMMARY OF CONTESTED FACTS

Williams is a former deliveryman employed by Flowers who is seeking payment for extensive overtime hours under the Fair Labor Standards Act ("FLSA"), and reimbursement of unlawfully assessed fines and deductions under the Louisiana Wage Payment Act ("LWPA").  The numerous disputed material facts establish that a trial on the merits is required.

The first dispute is whether as a matter-of-fact Williams' drove in interstate commerce within the meaning of the Motor Carrier Act ("MCA"). Since Williams' primary duty was daily delivery and restocking of product on a route wholly within Louisiana, which regularly consumed over 70 hours per week, he could not have reasonably been expected to engage in interstate transportation.  In fact, during the entirety of his Flowers employment, he never did. Williams also used personal vehicles to perform part of his duties every week. Williams was not subject to MCA jurisdiction, from which he was also excepted, remained covered by the wage and hour limitations of the FLSA,  and is due overtime.[2]

The second dispute of fact is whether Williams is covered by the Outside Sales Exemption ("OSE") exemption of the FLSA. Williams' primary duty was not to make sales.  Williams simply delivered replacement orders based on historical information, and as directed, stocked, and restocked shelves and rotated product. His primary responsibility was to supply and maintain the inventory of

---

[1] Rec. Doc. 47.
[2] Section A, pp. 4-14, *infra.*; Exhibit 1, Declaration of Solomon Williams, para. 18, 28-30.

Flowers' customers. Williams did no marketing and was prohibited from negotiating sales with Flowers' customers.  He was never covered by the OSE.[3]

The third dispute of fact is whether Williams was in fact an independent contractor or an economically dependent employee. Flowers nominally converted its deliverymen to "Independent Distributers" without relinquishing any control, which they have maintained through distributor agreements minutely enforced at Flowers' whim.[4] Williams did  not   make sales calls on Flowers' customers, or negotiate pricing, shelf space, and service requirements with local owners and managers, or sell bakery products. Williams never operated independently from the bakery, or for anyone besides Flowers, and could not negotiate prices, either with Flowers or its customers. Flowers micromanaged all of the deliverymen's duties and daily activities. Williams was never an independent contractor.[5]

The fourth dispute is whether Flowers assessed fines or made illegal deductions from Williams' wages in violation of the LWPA. Flowers admits that it made the deductions weekly, but disputes whether, as a matter of fact, they were fines or otherwise illegal.  In fact, the fines and deductions were made without any evidence of any damage to Flowers' goods or property, were intended to shift Flowers' cost of doing business, and must be reimbursed under the LWPA.[6]

The fifth dispute is whether Williams' claims under the LWPA are time barred. Williams' LWPA claims are not prescribed. Williams' claims interrupted prescription on February 23, 2018, when he opted-in. This original *collective* action was captioned *Richard, et al. v. Flowers Foods, Inc., et al*.[7] Any deductions made within the three years prior to that date are not prescribed.[8]

---

[3] Section B, pp. 14-16, *infra.*; Exhibit 1, Declaration of Solomon Williams, para. 3-6, 16, 25-27.
[4] This model now works like tenant farming in the past.
[5] Section C, pp. 16-27, *infra.*; Exhibit 1, Declaration of Solomon Williams, para. 3-6, 39-42.
[6] Section D(i), pp. 27-29, *infra.*; Exhibit 1, Declaration of Solomon Williams, para. 32-36.
[7] Docket number 15-cv-2557 filed in the Western District of Louisiana, Lafayette Division.
[8] *Richard, et al. v. Flowers Foods, Inc., et al.*, docket number 15-cv-2557 [Rec. Doc. 003].

## II.     SUMMARY JUDGMENT ON WILLIAMS' FLSA AND LWPA CLAIMS IS INAPPROPRIATE

Summary judgment is inappropriate where a "genuine dispute as to any material fact" remains.[9]

Flowers bears the burden of demonstrating the absence of any genuine issue of material fact.[10] A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.[11] Genuine issues of material fact exist when a rational trier of fact could find for the nonmoving party based on the evidence presented.[12] As the following discussion shows, that is certainly true for Williams here, and Flowers fails to satisfy its burden.

## FACTS

The detailed facts of Williams' employment are contained in the sworn declaration attached as Exhibit 1.  These are corroborated by detailed declarations of the other ten similarly situated plaintiffs in this action attached as Exhibits 17 through 26.[13] In general, Williams and the other plaintiffs were employed by Flowers for various periods from 2006 to present at the Monroe and Ruston warehouses of Flowers Tyler.  The most pertinent facts at issue here in Williams' case will be isolated and discussed at appropriate points in the legal arguments.

### A.  Williams Is Not Covered by the MCA Exemption

Flowers has "the burden to prove that the MCA exemption applies."[14] The "MCA Exemption" embodied in FLSA section 13(b)(1) provides that Section 7, overtime wages, shall not apply to any *employee* for whom the Department of Transportation's Federal Highway Administration has power

---

[9] Fed. R. Civ. P. 56(a).  See also *Amaya v. NOYPI Movers, L.L.C.,* 741 F. App'x 203, 204 (5th Cir. 2018).
[10] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Burfield v. Brown,* 51 F.3d 583, 588 (5th Cir. 1995).
[11] *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).
[12] *Nat' l Ass'n of Gov't Emps.  v. City Pub. Serv. Bd.,* 40 F.3d 698, 712-13 (5th Cir. 1994).
[13] Some of the Declarations may not reflect signatures at the time of filing but undersigned counsel anticipates that signed copies will be filed by each of the plaintiffs in connection with the opposition prepared and filed for that plaintiff.
[14] *Amaya v. NOYPI Movers, L.L.C.,* 741 F. App'x 203, 204 (5th Cir. 2018).

to establish qualifications and maximum hours of service pursuant to the MCA.[15] Courts should not "rubber-stamp an employer's assertion that the MCA exemption applies."[16]

"A 'driver,' as defined for Motor Carrier Act jurisdiction, is an individual who drives a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce."[17] Therefore the applicability of the exemption is determined by MCA authority with respect to the *driver employee*.[18]  Jurisdiction under the MCA depends not only on (1) the class to which the employer belongs[19] **but also (2) the class of work involved in the employee's job.**[20]  As defined by the MCA, only "drivers" who are also in "transportation" are exempted from the overtime requirements of the Fair Labor Standards Act by section 13(b)(1).[21]  Because Williams only drove in Louisiana, and was only engaged in *intra*state transportation, he is *not* excluded from Section 7 of the FLSA.

### i.  The FLSA and the MCA have different definitions of interstate commerce.

Flowers contends that because the goods it shipped from  Texas were transported into Louisiana for ultimate delivery by Williams, he was engaged in interstate commerce within the meaning of the FLSA. "Interstate commerce" in the FLSA is defined to "mean[ ] trade, commerce, transportation, transmission, or communication among the several States or between any State and any

---

[15] 29 C.F.R. 782. ("exemption is applicable to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935, (part II of the Interstate Commerce Act, 49 Stat. 546, as amended; 49 U.S.C. 304").
[16] *Amaya* at 206 (5th Cir. 2018).
[17] 29 C.F.R. 782.3.
[18] 29 C.F.R.782.1 (*Southland* v. *Bayley,* 319 U.S. 44; *Boutell* v. *Walling,* 327 U.S. 463; *Levinson* v. *Spector Motor Service,* 330 U.S. 649; *Pyramid Motor Freight Corp.* v. *Ispass,* 330 U.S. 695; *Morris* v. *McComb,* 332 U.S. 422)
[19] In *Goldberg v. Faber Industries*, 291 F. 2d 232, 234 (7th Cir. 1961), the court determined that employees were not subject to MCA jurisdiction under 49 U.S.C. 304. The employees had never been used in interstate commerce and could not reasonably be expected to handle an interstate run in the normal performance of their duties.
[20] 29 C.F.R. 782.2.
[21] 49 U.S.C. § 13101, *et seq.;* 29 U.S.C. § 202(b).*; See also, Southland,* 319 U.S. 44; *Levinson,* 330 U.S. 649; *Morris*, 332 U.S. 422; *Rogers Cartage Co. v. Reynolds*, 166 F.2d 317 (C.A. 6); 29 C.F.R. 782.2 (citing *United States v. American Trucking Assns*., 310 U.S. 534; *Walling v. Comet Carriers*, 151 F. (2d) 107 (C.A. 2)).

4

place outside thereof."[22] Under the FLSA, transportation within a single State is in interstate commerce when it is a part of a "practical continuity of movement" across State lines from the point of origin to the point of destination.[23] Williams does not dispute that he is involved in interstate commerce under the FLSA and entitled to overtime wages. But because the 13(b)(1) exemption from the FLSA is governed by the definitions in the MCA, not the FLSA, Williams remains covered under Section 7 of the FLSA and entitled to overtime.[24]

Under the MCA, "interstate commerce" is more narrowly defined as *only* (1) "the commerce *between* any place in a State and any place in another State," or (2) "between places in the same State *through* another State."[25] "Consequently, transportation by motor vehicle which is in interstate commerce under FLSA may not constitute transportation over which DOT has the power to exercise control and upon which the section 13(b)(1) exemption could be based."[26] Williams route and deliveries were exclusively within the state of Louisiana; he did not drive in either aspect of interstate commerce as defined in MCA.[27] The MCA does not extend to drivers, like Williams, that are not personally and directly involved in an interstate transportation of the goods as defined in the MCA.[28] Williams remains covered under Section 7 of the FLSA and entitled to overtime.

Long ago, under that same definition, the Interstate Commerce Commission held that transportation confined to points in a single State from a storage terminal of commodities, which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State, is ***not*** in

[22] 49 U.S.C. § 13101, *et seq.;* 29 U.S.C. § 203(b).
[23] 49 U.S.C. § 13101,*et seq.;* 29 C.F.R. 782.7(b)(1) (citing *Walling* v. *Jacksonville Paper Co.,* 317 U.S. 564; *Walling* v. *Mutual Wholesale Food & Supply Co.,* 141 F. (2d) 331 (C.A. 8); *Walling* v. *American Stores Co.,* 133 F. (2d) 840 (C.A. 3); *Baker* v. *Sharpless Hendler Ice Cream Co.* (E.D. Pa.), 10 Labor Cases, par. 62,956 5 W.H. Cases 926).
[24] 49 U.S.C. § 13101, *et seq.;* 29 U.S.C. § 202(b)*; Southland*, 319 U.S. 44; *Levinson*, 330 U.S. 649; *Morris* 332 U.S. 422; *Rogers*, 166 F.2d 317 (C.A. 6); 29 C.F.R. 782.2; *US*, 310 U.S. 534; *Walling*, 151 F.2d 107 (C.A. 2)).
[25] 40 CFR § 201.1.
[26] United States Department of Labor, *Field Operations Handbook,* Chapter 24, at 24d02. (https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-24#B24a00).
[27] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 8.
[28] 29 C.F.R. 782.7 (citing, *Wirtz* v. *Crystal Lake Crushed Stone Co.,* 327 F. 2d 455 (C.A. 7)); See also, United States Department of Labor, *Field Operations Handbook,* Chapter 24, at 24d02. (https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-24#B24a00).

interstate or foreign commerce within the meaning of part II of the Interstate Commerce Act (now the MCA) if the shipper had no "*fixed and persisting* transportation intent *beyond* the terminal storage point at the time of shipment". Ex parte No. MC–48 (71 M.C.C. 17, 29). The Commission also ruled that fixed and persisting intent ***did not exist*** where: (i) *at the time of shipment* there was *no specific customer order being filled for a specific quantity of a given product* to be moved through *to a specific destination beyond* the *terminal storage*, and (ii) the terminal storage was a distribution point or local marketing facility *from which specific amounts of the product are sold or allocated,* and (iii) *transportation* in the furtherance of this distribution *within the single State is specifically arranged only after sale or allocation from storage*.

Even now, according to the Department of Labor, under 29 CFR 782.7 a "fixed and persisting transportation intent" does not exist with respect to Williams' deliveries because the elements of that same test are satisfied.[29] This test was applied in *Baird v. Wagoner Transp. Co.*, 425 F.2d 407 (6th Cir. 1970) where truck drivers filed suit for overtime under the FLSA. As in *Baird,* Flowers Tyler bakery ships products to its terminal warehouse storage in bulk, not the ultimate customer, at the time of shipment.[30] Like the oil company in *Baird,* the warehouse employees allocate specific quantities of specific products to a specific route, not to a specific customer. The route deliverymen purchase in bulk, then allocate again different specific quantities of specific products to specific Flowers customers at specific destinations. Even if this process would otherwise be considered a "practical continuity of movement" in interstate commerce under the FLSA, because the MCA test is narrower, the interstate movement of Flowers commodities ends with the delivery to "a terminal storage facility," before the deliverymen's intrastate routes begin.[31]

---

[29] 29 CFR 782.7 (b)(2)

[30] *Baird* at 411 (6th Cir. 1970); See, Exhibit 15.

[31] United States Department of Labor, *Field Operations Handbook,* Chapter 24, at 24d02. (https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-24#B24a00); *Walling*, 317 U.S. 564, 63 S. Ct. 332, 87 L. Ed. 460 (1943); *Baird* at 411 (6th Cir. 1970) (distinguishing *Galbreath v. Gulf Oil*, 413 F.2d 941 (5th Cir. 1969)). *Galbreath* is highly distinguishable from this case. *Galbreath* could not give deference to the current DOL

As Williams' declaration specifically shows,[32] all three of the MCA test elements are satisfied here and show *at the time of shipment* that there *was no fixed and persistent transportation intent*.  At the time of shipment, Flowers Tyler did not load these goods for a specific order from a single customer, or for a specific product, or in any specific quantity to be later moved to any specific Flowers customer's specific destination.[33] The Tyler bakery loads the products for bulk shipment to the warehouse, not to the specific route, deliveryman, or the ultimate customer.[34] The specific product amount, type, and quantity is allocated by the warehouse to the route, and then further allocated by the deliveryman to the customer, before his intrastate delivery begins.[35]

The second element is also met. Flowers' warehouse is a "terminal storage" facility, not a customer specific destination. Each morning Flowers' warehouse employees, known as "pack out" persons, *allocate* product to routes, not specific customer destinations. After the "pack out" persons allocate product to the route, and the product is placed in the area allocated for each route. Specific quantities and types of products are sold at the warehouse to the deliverymen, not the customer.

---

and DOT regulations, which were established post-*Galbreath*. *Galbreath* involved petroleum products, not commingled perishables like bread and cakes. *Galbreath* did not involve the processing or allocation of product, as in this case. *Galbreath* did not involve the commingling of different products in one delivery out of the bakery. The Fifth Circuit has held that "interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Fraser v. Patrick O'Connor & Assocs., L.P.,* 954 F.3d 742, 748 (5th Cir. 2020) (quoting *Skidmore v. Swift*, 323 U.S. 134, 140, (1944) (considering the question of how much weight should be given to the DOL interpretation of the FLSA). In *Galbreath,* the employer's *s*hipments were 'predetermined' on the "basis of contractual commitment with customers." Here, Flowers does not have contractual agreements for specific amounts to ship to specific customers, rather Flowers uses historical data to ship, in bulk, products required by its warehouse, not the end customer. The warehouse order is re-allocated to the routes. Then each deliverymen reallocates the products allocated to their route to each specific customer's delivery location before he arranges the intrastate transportation.

[32] Exhibit 1, Declaration of Solomon Williams.

[33] In this case, products quantities and types are allocated three different times. First, bulk product type and quantity is **allocated** to the warehouse from the bakery.  Second, the "pack out" employees at the warehouse **re-allocate** the specific products, in specific quantities, to specific delivery routes. Third, the deliveryman **re-allocates** the specific products, in specific quantities, to specific Flowers' customer delivery locations. Finally, after three separate allocations, the deliveryman begins his **intrastate** transportation of the products.

[34] Exhibit 1, Declaration of Solomon Williams, para. 9-14, 24-27.

[35] Exhibit 1, Declaration of Solomon Williams, para. 9-14, 24-27.

Flowers itself argues that product title is then transferred to the deliverymen *at the warehouse* before the delivery to Flowers' customers begins.[36]

The third and final element is also satisfied.  After he has inspected the product which was allocated to his route the deliveryman then "purchases" the product for his account, reallocates different products and different amounts to each customer before specifically arranging his truck, trailer, or personal vehicle with specific quantities and products in such a way so as to facilitate his resale to each specific Flowers customer at its specific destination. Only then does intrastate transportation from the warehouse begin.[37]

Since the ICC, DOL and the *Baird* test elements are all met, there is no "fixed and persisting transportation intent at the time of [Flower's] shipment."[38] Even considering the prior interstate movements by Flowers, Williams is *not* a part of *interstate* transportation under the MCA.[39] Williams is a driver whose transportation is confined to a single state. The MCA is inapplicable to Williams. Since Williams does not fall within the jurisdiction and authority of the MCA, Flowers fails to satisfy its burden that they are entitled to summary judgment as a matter of law. Williams cannot be exempted by the MCA from the FLSA and its overtime requirements.

### ii.  Williams could not be reasonably expected to make interstate runs.

Ordinarily, the Department of Transportation's jurisdiction over drivers under the MCA is limited to those who have actually engaged in the interstate transportation of goods.[40] In exceptional cases, a driver can also be subject to the jurisdiction of the Department of Transportation if: "(1) the carrier is shown to have an involvement in interstate commerce *and* (2) it can be established that the driver or driver's helper could have, in the regular course of his/her employment, been reasonably

---

[36] Exhibit 1, Declaration of Solomon Williams, para. 13-14; [Rec. Doc. 51-1], pp. 13-14.
[37] Exhibit 1, Declaration of Solomon Williams, para. 13-14, 21.
[38] *Baird* at 411 (6th Cir. 1970)
[39]   United States Department of Labor, *Field Operations Handbook,* Chapter 24, at 24d02. (https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-24#B24a00) .
[40] *Id.*

8

expected to make one of the carrier's interstate runs". Flowers does not provide sufficient basis to establish that Williams "could reasonably have been expected to engage in interstate commerce consistent with their job duties."[41] Flowers fails to satisfy *either* of these conditions.

First, Williams' duties did not include, and he has never actually asked to or engaged in, interstate runs.[42] Furthermore, because he was already working overtime in the regular course of his employment, he could not be reasonably expected to also make interstate runs.[43] In fact, for several independently sufficient reasons it would be ***clearly unreasonable*** to expect Williams to make interstate runs to or from Tyler.[44] Deliverymen like Williams use box trucks, pick-up trucks, and small personal vehicles to deliver and service the customer to fulfill their duties.[45]  These types of motor vehicles could not hold the amount of product that is efficiently transported across state lines by Flowers' 18-wheelers hauling product in interstate commerce.[46] Second, Williams and  deliverymen like him have not been trained and are neither capable nor licensed to use 18-wheelers.[47] Third, Williams and other deliverymen's primary duty is to deliver and service a fixed route within a 100-mile radius of the warehouse, all of which is entirely within Louisiana.[48] Finally, Williams and his fellow deliverymen already had more work than they could do in an eight-hour day.[49]

Williams could not reasonably receive his allocation from the warehouse, deliver his route, conduct extra duties like pull-ups and hot shots; a special delivery necessary to replenish inventory, on a daily basis as much as seven days a week, ***and*** also be expected to conduct interstate runs when called upon to do by Flowers.[50] That would in itself violate the MCA limitations for driving hours.  Flowers

---

[41] *Amaya v. NOYPI Movers, L.L.C.,* 741 F. App'x 203, 204 (5th Cir. 2018).
[42] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 8; 23.
[43] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 7-8a, c; 23.
[44] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 8a-8e; 9; 23.
[45] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 28-30.
[46] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 8d.
[47] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 8d-e.
[48] *Id.;* Section A(iii), pp. 11, *infra;* Exhibit 1, Declaration of Solomon Williams, para. 4; 8b; 22.
[49] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 3; 7.
[50] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 7-8; 17; 30.

does not even contend that it ever expected Williams to make interstate runs in the regular course of his employment, because to do so would admit an intentional violation of the MCA by Flowers as a registered motor carrier. The jurisdiction set forth in the MCA does not attach if there is no reasonable expectation that the individual driver will travel across state lines.[51] Williams, therefore, is not a "driver"[52] covered by the MCA.[53]

###   iii.   Flowers does not apply the MCA to its deliverymen.

Even Flowers does not truly believe the MCA should be applied to its deliverymen. If that had been true, Flowers, as a registered motor carrier, would have itself repeatedly and intentionally violated the MCA daily limitations for hours, and subjected itself to an enforcement action by the Secretary of Transportation.  Flowers has never sought to use its deliverymen under the MCA, or required deliverymen to carry commercial driver's licenses, or to keep a record or log of on or off duty status, drive times, or to use an electronic logging device, or to comply with maximum drive times.[54]  The only time Flowers looks to implement the MCA is years after the fact, and only to avoid its obligation to pay its employees for overtime wages under the FLSA.[55]  In fact, Flowers never pretended its deliverymen were subject to the MCA before it converted them from employees to so-called independent contractors, even though they functioned identically, or even until after its converted deliverymen sought to recover overtime.[56]

---

[51] *Baird* at 411 (6th Cir. 1970); *Goldberg*, 291 F. 2d 232 (7th Cir. 1961).
[52] 29 C.F.R. 782.3. ("A 'driver,' as defined for Motor Carrier Act jurisdiction is an individual who drives a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce.").
[53] Letter dated February 19, 2016, DOT Federal Motor Carrier Safety Administration determined that an identically situated Louisiana Flowers Distributor was **not** subject to DOT registration or regulation because "his truck does not cross the state line because he only does business in the State of Louisiana."   See Exhibit 9.
[54] Exhibit 1, Declaration of Solomon Williams, para. 7-8d,e; 49 C.F.R. 395.
[55] Even if Flowers sought full adherence to the MCA, the deliverymen are still exempted therefrom under the short haul exception. 49 C.F.R. 395.  The MCA does not apply to drivers driving only "within a 100 air-mile radius of the normal work reporting location". 49 C.F.R. 395.  Drivers, like Williams, working in a small, designated area and route are not the "motor carriers" defined in the MCA and bound by its rules and regulations.  49 C.F.R. 395.
[56] Exhibit 14, Jimmy Woodward deposition, pp. 33-34; *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490, 494 (W.D.N.C. 2016) ("Distributors share the same primary job responsibility of servicing Defendants' customers in accordance with 'good industry practice' as described in their Distributor Agreements.)

### iv.  Williams is also excluded from MCA jurisdiction under the TCA exception.

Even if Williams were otherwise covered by the MCA, he would be excluded under the Small Vehicle Exception, Section 306 (c) of the Technical Corrections Act[57] ("TCA").  The TCA defines a "covered employee" as an individual:

(1) who is employed by a motor carrier or motor private carrier . . .;
(2) whose work, **[even if only] in part**, is defined –
    a.  as that of a **driver** . . . ; **and**
(3) **who performs duties on motor vehicles weighing 10,000 pounds or less.**
[Emphasis added.]

No worker who is covered by the TCA, that is, if he (1) regularly performed work in smaller vehicles, and (2) as even any part of his job duties, can be exempt from the FLSA under the MCA.[58] Even in weeks where employees worked in vehicles weighing more than 10,000 pounds, those employees would still be entitled to overtime if they also worked, even part of the time, in vehicles weighing less than 10,000 pounds.[59]

At certain times, and always for hot shots, pull ups and stales/shrinks, Williams or his helper used his personal vehicle every week.[60] Williams usually carried a few cases of bread in his personal vehicle in case a delivery stop was in need.[61]

It should be noted here that Flowers first presented the identical arguments regarding the MCA and TCA to defeat the claims of the Flowers first deliverymen claiming overtime in North Carolina by Motion for Summary Judgment. This argument was rejected, and summary judgment was denied by the Court.[62] A copy of that well-reasoned decision is attached hereto as Exhibit 11.

---

[57] SAFETEA-LU Technical Corrections Act of 2008, PL110-244, June 6, 2008, 122Stst 1572, 1620.
[58] SAFETEA-LU Technical Corrections Act of 2008, PL110-244, June 6, 2008, 122Stst 1572, 1620; *Carley v. Crest Pumping Techs., L.L.C.,* 890 F.3d 575, 579 (5th Cir. 2018); *Aikens v. Warrior Energy Services*, 2015 WL 1221255 (S.D. Tex. 2015);  *Moore v. Performance Pressure Pumping, et al,* 5:15-cv-432 c/w 5:15-cv-346 (W.D. Tex. 2017).
[59] *Roche v. S-3*, 154 F. Supp. 3d 441, 448 (W.D. Tex. 2016), discussing Department of Labor, Wage & Hour Division, Fact Sheet # 19 (November 2009) available at http://www.dol.gov/whd/regs/compliance/whdfs19.pdf.
[60] Solomon Williams' Deposition p. 70 l. 3-8; See also, Exhibit 1, Declaration of Solomon Williams, para 28-30.
[61] See also, Exhibit 1, Declaration of Solomon Williams, para 30.
[62] See, *Rehberg*, 162 F.Supp.3d 490 (W.D.N.C. 2016).

### v. Flowers disregards the consistent intent and purpose of both the MCA and the FLSA.

Both the FLSA and the MCA seek to reduce hours of employees. The FLSA limits hours by requiring an overtime premium for additional hours worked beyond regular time. The MCA also limits hours for drivers by placing a maximum limitation on the hours that can be worked by MCA drivers.[63] Flowers' argument, if successful, would be tantamount to Flowers, as a motor carrier itself,  violating the MCA and frustrating the consistent intent of both the FLSA and the MCA to limit hours. Flowers never required Williams to abide by the hours limitations, check in requirements, logging requirements, or electronic logging procedures set forth in the MCA.[64] Flowers only seeks application of the MCA to continue its unpaid overtime hours by deliverymen employees. If allowed, this application of the MCA would allow Flowers to use the MCA to avoid FLSA overtime requirements, while also allowing Flowers to avoid the statutory service hour limits the MCA. Flowers is urging the application of the MCA to the FLSA without fulfilling the purpose of *either law.*

### B.  Williams Is Not Covered by the Outside Sales Exception

According to FLSA regulations, "Drivers who deliver products and also sell such products may qualify as exempt outside sales employees **only** if the employee has a *primary* duty of making sales."[65] An employee's primary duty "means the principal, main, major or most important duty that the employee performs."[66]   Furthermore, the Outside Sales Exemption has specific regulatory requirements for "Drivers who Sell," which provide an overview as to how to determine whether a deliveryman who also makes sales qualifies as exempt.  29 CFR § 541.504 (d)(2) and (3) states:

(d)  Drivers who generally would **not** qualify as exempt outside sales employees include:
   . . .
   2.  A driver who often **calls on established customers day after day** or week after week, **delivering a quantity of employer's products at**

---

[63] *Carley, 890 F.3d 575, 579 (5th Cir. 2018)* (*Morris*, 332 U.S. 422, 436 (1947)).
[64] Exhibit 1, Declaration of Solomon Williams, para 7; 49 U.S.C. § 13101, *et seq.*
[65] 29 C.F.R. § 541.504(a) [Emphasis added]; See also, Exhibit 1, Declaration of Solomon Williams, para 4-6.
[66] 29 C.F.R. § 541.700(a); See also, Exhibit 1, Declaration of Solomon Williams, para 4-6.

each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery. [Emphasis added].

3. A driver primarily engaged in **making deliveries to customers and performing activities intended to promote sales by customers** (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), **unless such work is in furtherance of the driver's own sales efforts.**" [Emphasis added].

These regulation subparagraphs so precisely describe the distributor functions as *not* qualifying for the exemption that Flowers' arguments on this point are in obvious bad faith. The ratio of Williams accounts by dollar sales was approximately 75% national or authorized accounts and 25% cash accounts.[67] Williams received historical sales data for each Flowers customer on Flowers' handheld computer and delivered Flowers' products from Flowers' warehouses to Flowers' customers. Williams did not market or sell bakery products to Flowers' customers.[68]

As the Supreme Court recently clarified, courts are to give FLSA exemptions a "fair reading",[69] but Flowers completely fails to produce any evidence that suggests the primary duties of its deliverymen are to make sales. In fact, Williams' primary job duty was delivery.[70] He was primarily responsible for delivery, stocking and restocking shelves, rotating and ordering replacement product.[71] Williams had little or no discretion to alter products or quantities for Flowers customers ordered through his account.[72] Williams was simply fulfilling product requests according to sales history pursuant to agreements made between Flowers and the customer, wherein Flowers had already agreed to sell, and the customer had already agreed to buy, specific products.[73]

---

[67] Exhibit 1, Declaration of Solomon Williams, para 4.
[68] Exhibit 1, Declaration of Solomon Williams, para 5.
[69] *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142, 200 L.Ed.2d 43 (2018); See also, Exhibit 1, para 4-6.
[70] Exhibit 1, Declaration of Solomon Williams, para 3.
[71] Exhibit 1, Declaration of Solomon Williams, para 4, 5, 6, and 16.
[72] Exhibit 2, Deposition of Solomon Williams, pp. 53-55; 117-122; Exhibit 1, Williams Declaration , para 26-27.
[73] Exhibit 1, Declaration of Solomon Williams, para 25-27.

Furthermore, Flowers handled all sales and marketing activities to its customers to the exclusion of Williams.[74]  National account managers engage in all promotional activities and client contact:[75] "[T]heir responsibility is to build relationships with those chain customers to try to get access to the market, space in the stores, best position on the bread rack, working with them on promotional opportunities and display opportunities. So it's really -- I mean, in its simplest format, it is to build relationships with the national account customers to garner access to the market."[76] Likewise, Flowers' sales managers and directors seek out new accounts, implement marking plans, and "maintain communications with customers and management in retail and/or restaurants in their specified market area."[77] As a result, only Flowers entered into agreements to sell products to its customers; Williams did not.[78]

It should be noted here that the identical facts regarding OSE were presented by Flowers through Motion for Summary Judgment to defeat the claims of Flowers first deliverymen to claim overtime in North Carolina. This argument was rejected, and summary judgment denied by the Court.[79] A copy of that well-reasoned decision is attached hereto as Exhibit 11.

### C.  Williams Was Entitled to Protection Under the "Economic Realities" Test as an FLSA Employee

The Fair Labor Standards Act ("FLSA"), defines "employ" broadly as including anyone the employer allows "to suffer or permit to work."[80] The FLSA defines "employer" as "any person acting directly or indirectly in the interest of any employer in relation to an employee."[81] "The remedial

[74] Exhibit 2, Deposition of Solomon Williams, pp. 100; Exhibit 1, Declaration of Solomon Williams, para 5.
[75] Exhibit 6, pp. 43-48, 79, 105, 107, 193; Exhibit 10, at pp. 50-54; Exhibit 7, pp. 62; Exhibit 12, 30 (b)(6) Deposition of Chuck Rich at pages 160-161; Exhibit 1, Declaration of Solomon Williams, para 5.
[76] Exhibit 12, at pp. 160-161; Exhibit 1, Declaration of Solomon Williams, para 4-6.
[77] Exhibit 6, pp. 26-30.
[78] Majority of Flowers' customers to whom Williams delivered were national or authorized accounts. Minority of accounts were "cash accounts." Exhibit 1, Williams Decl., para. 4. A "cash account would mean Jimmy's Deli that buys ten dollars' worth a week, I'm going to stop and drop him off a couple of loafs of bread and they're going to pay me the ten dollars, the driver ten dollars." Exhibit 14, Woodward depo., pp. 42, line 23 through pp. 43, line 2.
[79] See, Rehberg, 162 F.Supp.3d 490 (W.D.N.C. 2016).
[80] 29 U.S.C. § 203(g).
[81] 29 U.S.C. § 203 (d).

14

purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications."[82] The United States Court of Appeals for the Fifth Circuit has described the FLSA definition of "employer" as "particularly broad."[83]

"In determining employee/independent contractor status, the 'relevant question is whether the alleged employee *so economically depends* upon the business to which he renders his services, such that the individual, as a matter of economic reality, is not in business for himself.'"[84]

Williams may have the initial burden to show that he was an employee of Flowers, but:

Once the employee establishes a *prima facie* case, the burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."[85]

Williams has provided *prima facie* evidence that he was an employee by the prior agency employment for the same function, in which he was paid overtime and the control exercised by Flowers over the minute details of his performance.[86] In this case, Flowers itself classified deliverymen as employees, trained them as employees, then converted them to independent contractors where they performed the same functions they did as employees, under the same control by Flowers but no longer paid the deliverymen the overtime pay they received as employees.[87] Flowers still has employees that perform the exact same function on routes held for resale.[88]

Also, as part of his *prima facie* case, Williams shows that since 1987, following the IRS' refusal to recognize the deliverymen as independent contractors, Flowers has classified deliverymen as "statutory employees".[89] A former Flowers' executive, Jimmy Woodward, explained that Flowers "specifically changed from treating [deliverymen] as nonemployees to statutory employees. That was

---

[82] *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989).
[83] *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008) .
[84] *Hobbs* at 829 (5th Cir. 2020). (emphasis added);  Exhibit 16, pp. 44-46.
[85] *Johnson v. Heckmann Water Resources (CVR), Inc.,* 758 F.3d 627 at 630 (USCA 5 Cir. 7/14/14).
[86] Exhibit 8, at Paragraph 16.2, page 11.
[87] Exhibit 16, pp. 178-180.
[88] Exhibit 15, internal Exhibit 1, page 9, ¶ 30.
[89] Exhibit 8, at Paragraph 16.2, page 11; Exhibit 16, pp. 184, line 24 through pp. 185, line 16.

a huge change. . . the decision was made that the risk was too great under this arrangement where you had this classification called a statutory employee".[90] To make the statutory employee designation, Flowers annually represents to the IRS statements that conflict with Flowers' assertions.[91] The statutory employee designation by Flowers belies any assertion by Flowers that Williams had a "substantial investment in the business."[92] For decades, Flowers has acceded to the IRS' refusal to treat deliverymen as independent contractors, and has classified and treated them as statutory employees.[93]

Finally, Williams' *prima facie* case will include the expert testimony of Shawn Kantor, Ph.D. in Economics, whose report is attached as Exhibit 15 and incorporated herein by reference:

> While the Court's economic realities test may not necessarily be grounded in economic theory, many of the insights that I developed above based on the theory of the firm and labor economics are highly complementary to the Court's assessment of the economic reality of a worker's independent contractor versus employee status. I will evaluate each of the economic reality factors, ...[94]

Hereafter, the analysis focuses on whether Movants have carried their burden to establish that Williams was an independent contractor and not an employee. To distinguish between an employee and an independent contractor, the Fifth Circuit applies an "economic realities" test. "This court utilizes 'five non-exhaustive factors' to guide this inquiry",[95] including: 1) the degree of control exercised by the alleged employer over the details of the work, 2) the extent of the relative investments of the worker and the alleged employer, 3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer, 4) the skill and initiative required in performing the job, and 5) the permanency of the relationship.[96]

---

[90] See Exhibit 14,  Jimmy Woodward deposition, pp. 28, line 8 through 25.
[91] 26 U.S.C. §3121(d)(3); (d)(1).
[92] Flowers consistently paid the employer's share of FICA taxes and Medicare. Nevertheless, despite years of these representations to the IRS, and corresponding deductions, Flowers now advances assertions to the contrary.
[93] See Exhibit 8, at Paragraph 16.2, page 11.  See also, Exhibit 14, at pp. 44.
[94] Exhibit 15, internal Exhibit 1, p. 32, ¶ 92.
[95] *Hobbs* at 829 (quoting *Hopkins* at 343.)
[96] *Hopkins* at 343 (5th Cir. 2008).

Each factor is a tool used to gauge the economic dependence of the alleged employee and no single factor is determinative.[97] The focus of the Fifth Circuit is on the "***economic dependence***" of Williams, the touchstone for the totality of circumstances test.[98] "It is not what [Williams] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive".[99] In the present case, there are numerous material issues of fact regarding the factors in determining employee status.

1) **Degree of Control.**

Degree of control refers to whether the Williams possesses "real independence" in the economic relationship.[100] When an employer requires workers to work whatever hours it demands, even if those demands are driven by customer needs, workers cannot be said to exercise such a degree of control that they stand as separate economic entities.[101] "The relevant determination is whether 'the worker has a viable economic status that can be traded to other companies, keeping in mind that lack of supervision of the individual over minor regular tasks cannot be bootstrapped into an appearance of real independence.'"[102]

Dr. Kantor "use[s] the generic term 'deliveryman' in this report to describe the Plaintiff's role in delivering Flowers baked goods to [Flowers'] customers."[103]  Flowers "national accounts team are actively selling ***their*** products to ***their*** customers and the deliveryman are doing their role, delivering bread".[104] Williams "worked 71.5 hours per week servicing Flowers's customers, which left no time to develop an independent (i.e., non-bakery) delivery business."[105]

---

[97] *Hopkins* at 343 (5th Cir. 2008).
[98] *Brock v. Mr. W Fireworks, Inc*., 814 F.2d 1042, 1044 (5th Cir. 1987)  (emphasis in the original).
[99] *Hobbs v. Petroplex Pipe & Constr., Inc.,* 946 F.3d 824, 833 (5th Cir. 2020)  (quoting *Brock* at 1047).
[100] *Hopkins* at 343 (5th Cir. 2008); Exhibit 16, pp. 157, lines 1-19; Exhibit 15, pp. 32-33.
[101] *Hopkins* at 343 (5th Cir. 2008).
[102] *Hobbs* at 830 (5th Cir. 2020)  (quoting Parrish v. Premier, 917 F.3d 369, 381 (5th Cir. 2019) .
[103] Ex. 1, pp. 5, attached to Ex. 15; Exhibit 14, Woodward depo., p.41. ("The customer pays the company, Flowers")
[104] Exhibit 16, pp. 104, line 10-12.
[105] Exhibit 15, internal Exhibit 1, p. 7.

Williams is a keystone example of the *ad hoc* and unilateral control Flowers exerts over its deliverymen.[106] When a Flowers' customer, Sav U Mor, decided Williams could no long service the store, allegedly for inadequate stocking,  Flowers issued a breach letter to Williams.[107]  Flowers demanded Williams resume service of the Sav U Mor and stock product, or else Flowers would terminate him as a deliveryman for Flowers. Williams even confirmed with Flowers' management, Dennis Gates, that Sav U Mor was, in fact, adequately stocked.  Nonetheless, Flowers followed through on its threat and arbitrarily terminated Williams. Flowers terminated Williams at will, like any other employee, not based on a specific provision of Williams' contract.  Williams' termination illustrates how Flowers uses the "10-day letter"[108] provision and the vague phrase "best practices" to effectuate an "at will termination", just as if they were at-will employees. This procedure is tantamount to termination of an at-will employee, not an independent contractor.

Flowers also controlled its deliverymen, by: (1) requiring mandatory compliance with all promotional and feature pricing,[109] (2) not consulting deliverymen for approval of feature pricing,[110] (3) requiring deliverymen to service all outlets in the delivery territory,[111] (4) requiring deliverymen to obtain approval to use advertising materials not supplied by Flowers,[112] (5) requiring Flowers' written approval to sell any rights to the delivery territory,[113] (6) retaining a right of first refusal to the delivery territory,[114] (7) prohibiting deliverymen from carrying or distributing products Flowers unilaterally deemed competitive, (8) imposing restrictions on stale products, and (9) imposing a Covenant Not to Compete.[115]

---

[106] Exhibit 1, Declaration of Solomon Williams, at para. 39 through 42.
[107] Exhibit 5.
[108] Exhibit 5.
[109] Exhibit 8, at Paragraph 13.2, page 9.,
[110] Exhibit 1, Declaration of Solomon Williams, at para. 39 through 42.
[111] Exhibit 8, at Paragraph 2.6, Page 2; Exhibit 1, Declaration of Solomon Williams, at para. 39 through 42.
[112] Exhibit 8, at Paragraph 13.1, page 9.
[113] Exhibit 8, at Paragraph 15.1, page 9.
[114] Exhibit 8, at Paragraph 15.2, page 10.
[115] Exhibit 8, at para 5.1, 12.1, 12.2, 12.3, and 21.8; Exhibit 16, pp. 123-124.

Williams' days would begin at the Flowers warehouse to allocate and arrange product onto his truck.[116] Prior to his arrival, Flowers' warehouse employees had sorted, organized, and packed the product for the route.[117] Williams would then re-allocate to customers and arrange the product on the truck he purchased from Flowers. He would then proceed on his route under the supervision of his Flowers area sales director.[118] Williams was contractually required to deliver the products Flowers directs that are requested or authorized by the customer, over which Williams had no control.[119]

Williams was required to service customers at a frequency and "service window" dictated by Flowers or its customers.[120] Williams did not participate in the negotiation.[121] Upon delivery at a customer's store Williams was required to follow a predetermined "planogram" given to them by Flowers. Flowers negotiates the planogram for all deliverymen. Williams had no discretion in designing the planogram or changing the products it included.[122] Williams was instructed by Flowers on the procedure for rotating and removing product.[123]

Williams was required to place an order for Flowers' product on his account.[124] Williams began with a "suggested order" provided on his handheld by Flowers, which is the default quantity for which he would place a bulk product order for the following week.[125] Flowers retains ultimate control over order quantities and can adjust orders without advance notice to Williams, much less with his consent.[126] Williams was required to return to the warehouse no later than 5:00 pm each day to sell back stale products. This resale of stale product was unilaterally conditioned by Flower.[127] At the end

---

[116] Exhibit 2, p. 68; Exhibit 13, Rich Deposition I, pp. 48; Rich Deposition II, pp. 144, 152.
[117] Exhibit 2, p. 49, lines 15-20; Exhibit 13, at pp. 49-50.
[118] Exhibit 2, p. 49, lines 15-20; Exhibit 13, at pp. 50-51.
[119] Exhibit 2, p. 53-54; *See also,* Exhibit 11, *Rehberg,* 2015 WL 1346125, at *14 (W.D.N.C. Mar. 24, 2015.
[120] Exhibit 2, p. 47, line 7, p. 48, lines 5-8.
[121] Exhibit 2, p. 47, line 7, p. 48, lines 5-8.
[122] Exhibit 2, p. 53-54; Exhibit 13, at pp. 96-97; Exhibit 16, pp. 124, lines 9-21.
[123] Exhibit 2, p. 58-59, p. 122, lines 11-14.
[124] Exhibit 2, p. 49, lines 15-20.
[125] Exhibit 2, p. 58-59, p. 122, lines 11-14; Exhibit 13, at pp. 56; 146; Exhibit 16, pp. 100-101.
[126] Exhibit 13, at pp. 55-56, 234.
[127] Exhibit 13, at pp. 126-127.

of the day, Williams was required to dock the Flowers handheld computer in a cradle at the Flowers' warehouse.[128]

Kantor says:

[T]he evidence that establishes that Flowers had exceptionally high control over Solomon Williams's work life as a deliveryman has been presented above. …  By employment, a firm uses its fiat and hierarchy to command cooperation, monitor behavior, reward or penalize behavior, and resolve disputes. … For a vast majority of his delivery work, Mr. Williams lacked the ability to exercise any initiative within the Flowers business model.

\*   \*   \*

Therefore, Flowers's time requirements meant that Mr. Williams's control over his own profits and losses were limited.[129]

### 2) Relative Investments.

"In applying the relative-investment factor, [courts] compare each worker's individual investment to that of the alleged employer."[130] Courts consider "the amount the alleged employer and employee each contribute to the specific job the employee undertakes."[131] Because the IRS recognized that the deliverymen had no real investment in their territories, Flowers has, since 1987, classified the distributors, including Williams, as "statutory employees".[132] Woodward testified that, "the company specifically changed from treating them as nonemployees to statutory employees. That was a huge change...the decision was made that the risk was too great under this arrangement where you had this classification called a statutory employee".[133]

This designation of Williams as a "statutory employee" to the IRS contradicts Flowers' current assertion that Williams made a substantial investment in his business. In making the statutory employee designation, Flowers annually made the following required representations to the IRS: 1) Williams was

---

[128] Exhibit 13, at pp. 57-58; 150; Exhibit 16, pp. 100-101.
[129] *Id*.  Exhibit 15, internal Exhibit 1, p. 32, ¶¶ 93, 95, 96.
[130] *Hopkins* at 344; (*Herman v. Express Sixty-Minutes Delivery Services, Inc.,* 161 F.3d 299, 304 (5th Cir. 1998).
[131] *Thibault v. Bellsouth Telecommunications, Inc.,* 612 F.3d 843, 847 (5th Cir. 2010); See also *Carrell v. Sunland Construction, Inc.,* 998 F.2d 330, 334 (5th Cir. 1993) (citing *Herman* at 303).
[132] Exhibit 8 at Paragraph 16.2, page 11; Exhibit 15, pp. 33-34.
[133] See Exhibit 14,  Jimmy Woodward deposition, pp. 28, line 8 through 25.

an agent of Flowers, 2) Williams was paid on a commission basis, 3) Williams substantially performed services personally, 4) Williams performed services for Flowers on a continuing basis, and 5) Williams **did not have a substantial investment in his equipment or property**.[134]

The statutory employee designation by Flowers belies any assertion by Flowers that Williams had a "substantial investment in the business."[135] Williams was required to "purchase" a "territory", but Flowers did not require Williams to make any down payment.[136] Flowers set the price Williams paid and financed the purchase payments taken from Williams's weekly settlement statement.[137] Flowers argues that the purchase was an "investment" and that Williams was able to build up "equity". The deposition of Flowers' own Jimmy Woodward shows, the IRS rejected these assertions because Flowers financed these purchases with interest, so the "investment" was really Flowers', not the deliverymen.[138] Williams paid Flowers a great deal of money for the "privilege" of operating a Flowers territory. The IRS was clearly correct in finding the distributors did not have a "substantial investment" in their territory.

Any monetary outlays by Williams are insignificant when compared to Flowers' investment. Flowers invested millions of dollars to support their enterprise.[139] On that basis alone, Williams' "investment" pales in comparison to Flowers'. Williams' expert, Dr. Kantor, notes "Mr. Williams brought no monetary investment to his new Flowers delivery venture."[140] Dr. Kantor highlights that

---

[134] 26 U.S.C. §3121(d)(3); 26 C.F.R. §31.3121(d)–1.
[135] FBC-Tyler has consistently paid the employer's share of FICA taxes and Medicare on behalf of Williams. Nevertheless, despite years of these representations to the IRS, and corresponding deductions, Flowers now advances assertions to the contrary for purposes of this arbitration proceeding.
[136] See Exhibit 1, Declaration of Solomon Williams.
[137] See Exhibit 1, Declaration of Solomon Williams.
[138] Exhibit 14, Woodward depo., pp. 20-23. Mr. Woodward was the former Vice President and Chief Financial Officer of Flowers Foods, Inc.  He was responsible for all tax issues.  He retired from Flowers Foods in 2007 and is currently an instructor of federal income taxation at Florida State University and a private entrepreneur.
[139] In the fiscal year ended December 30, 2017, Flowers had gross sales of 3.9 billion, gross value of property over 1.9 billion, spent 3.5 billion in operating expenses, generated 297.4 million of net cash from operations, had 75.2 million in capital expenditures, and paid dividends of 141 million; See Exhibit 27, pp. 32 and 44.
[140] Exhibit 15, internal Exhibit 1, p. 22.

21

Williams "didn't pay anything. He got a loan from Flowers, a 100 percent LTV loan."[141] He explains that "at the time [Williams] is starting up his territory. He's putting no money down...So he's got no…money out-of-pocket in this enterprise."[142] Former Flowers' executive, Jimmy Woodward, testified, "On the balance sheet of Flowers…when the company sells a territory to a driver...the guy has no capital...The company says, 'I'll sell you the territory. You owe me $250,000.' That 250,000 is a note receivable on the balance sheet...There's no allowance for doubtful accounts...[and] there is no risk of loss to that distributor".[143] Dr. Kantor says:[144]

> Flowers had a minimum of $328,340 worth of assets at stake in the relationship. At the time Mr. Williams purchased his territory, he had a $0 investment stake at risk.[145]

### 3)   Worker's Opportunity for Profit.

Williams did not "control[] the major determinants of the amount of profit which the worker could make."[146] "In evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs. For that purpose, evidence gleaned from tax returns can be useful."[147] Flowers controlled virtually every aspect of the economic relationship with the customer and Williams.[148] Flowers asserts Williams made a significant "profit" from operating his territory. Flowers relies on its own gross income calculations and ignore substantial expenses, such as fuel and vehicle repairs. There can be little doubt that in the relationship between Flowers and Williams, Williams was economically dependent upon Flowers.[149]  According to Dr. Kantor:

> The salient point to reiterate here is that Mr. Williams was completely beholden to Flowers for determining the price of the goods on which his discount (or margin) percentage would apply. … Mr. Williams spent well beyond normal fulltime hours to fulfill his Flowers obligations. The Flowers work, for all intents and purposes,

---

[141] Exhibit 16, p. 91, lines 12-13.
[142] Exhibit 16, p. 166, lines 1-6.
[143] See Exhibit 14,  Jimmy Woodward deposition, p. 46, line 5 through p. 48, line 3.
[144] Exhibit 15, internal Exhibit 1, p. 34, ¶ 100.
[145] Exhibit 15, internal Exhibit 1, p. 34, ¶ 100.
[146] Exhibit 1, Williams Dec., para. 4-5, 7-14, 18, 24-27; *Hopkins* at 344; *Usery,* 527 F.2d 1308, 1313 (5th Cir. 1976).
[147] *Hobbs*, at 832. (citing *Parrish*, at 384); Exhibit 3; Exhibit 4; Exhibit 15, pp. 34-35.
[148] Exhibit 1, Declaration of Solomon Williams, ¶¶ 4-5, 7-14, 18, 24-27.
[149] Exhibit 1, Declaration of Solomon Williams, ¶¶ 4-5, 7-14, 18, 24-27; *Hopkins* at 344, (citing *Usery* at 1313).

controlled and limited any upside potential he might have envisioned as an alleged independent deliveryman.[150]

### 4) Skill and Initiative.

The next factor is "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status."[151] "Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status."[152] In determining the "skill and initiative" factor the Courts look at whether Williams has some unique skill set or ability to exercise significant initiative.[153] There is insufficient initiative when all major components were controlled by the employer.[154] Routine work is not indicative of independence and nonemployee status.[155] Skills that are not specialized, but common to all employees support employee status.[156]

Williams' job did not require advanced knowledge or skill. There are no educational requirements, job experience, or specific skills required to become a deliveryman. Williams had to do things the way Flowers or its customers told him. He could not exercise any significant initiative outside of Flowers instructions.

Flowers prevented Williams from distributing competitive products[157] and contractually restrained him from selling any competitive product to any of his prior customers for one year after his termination.[158] Williams could not terminate the agreement without also assuming the costs associated with servicing his territory until the territory was transferred, assigned, or sold.[159] Flowers, on the other

---

[150] Exhibit 15, internal Exhibit 1, pp. 34-35, ¶¶ 101-104.
[151] *Hopkins* at 344 (5th Cir. 2008) (citing *Usery* at 1313); Exhibit 15, pp. 35-36.
[152] *Hobbs* at 834 (5th Cir. 2020) (quoting *Parrish*, 917 F.3d at 385).
[153] *Parrish* at 385 (5th Cir. 2019); *Hopkins* at 345.
[154] *Parrish* at 385; *Usery* at 1314.
[155] *Parrish* at 385; *Usery* at 1314.
[156] *Parrish* at 385; *Hopkins* at 345.
[157] Exhibit 8, at Paragraph 5.1, page 4.
[158] Exhibit 8, at Paragraph 21.8, page 18.
[159] Exhibit 8, at Paragraph 17.4., page 12.

23

hand, could terminate the agreement by manipulating the flexible standards it employed in the Distributor Agreement.[160]

Flowers controlled and oversaw nearly all aspects of Williams' job. This was for the purpose of maximizing Flowers' profits, and not to address any of Williams' concerns.[161] Based on these factors, Williams' is an employee of Flowers. Flowers' corporate designee in this litigation summed up the relationship best: "typically when [Flowers is] dealing with customers, what's in the best interest of the company is also in the best interest of the [deliveryman]."[162]  According to Dr. Kantor:

> Mr. Williams possessed no unique skill [beyond] his ability to be responsible, prompt, courteous, respectful, helpful, efficient, and to drive safely. But these traits are largely characteristic of all successful American workers, even those employed as delivery drivers.
>
> \*   \*   \*
>
> Flowers has historically used … company-employed workers to service territories across the U.S.[163]

### 5) Permanency of the Relationship.

The final factor is "the permanency of the working relationship."[164] "Relevant to this factor is 'whether any plaintiff worked exclusively' for [Flowers], 'the total length of the relationship,' and 'whether the work was on a project-by-project basis.'"[165] Williams worked "exclusively" for Flowers during "the total length of the relationship" and was never on a "project-by-project basis."[166]  As Dr. Kantor says:

> Mr. Williams's work with Flowers was not only relatively long-lived, but it was exclusive.
>
> \*   \*   \*
>
> Evaluating the facts of Mr. Williams's work as a Flowers deliveryman against the Court's non-exhaustive five economic realities factors corroborates my analysis above based on the modern economic theory of the firm. Flowers senior managers maintain that distributors "own their own business," but in practical economic terms this

---

[160] Exhibit 8, at Section XVII, page 12.
[161] Exhibit 1, Declaration of Solomon Williams; *See,* Exhibit 11, *Rehberg* at \*14 (W.D.N.C. Mar. 24, 2015).
[162] Exhibit 13, at pp. 119.
[163] Exhibit 15, internal Exhibit 1, p. 35, ¶¶ 106-107.
[164]*Hopkins* at 344 (citing  *Brock* at 1047); Exhibit 15, internal Exhibit 1, Declaration of Shawn Kantor, p. 36.
[165] *Hobbs* at 834. (citing *Parrish*, 917 F.3d at 387).
[166] *Id.;* Exhibit 1, Declaration of Solomon Williams, para. 3.

argument is wholly disingenuous.104 Mr. Williams so economically depended upon Flowers in his work as an Independent Distributor that, in reality, he was not truly in business for himself. Again, my expert opinion as a professional economist is that Mr. Williams was an employee of Flowers, not an independent contractor.[167]

**D. Summary Judgment Should Be Denied on Williams' LWPA claim.**

**i. Flowers Assessed Fines In Violation of the LWPA.**

Under the Louisiana Wage Payment Act, La. R.S. 23:631 *et seq.*, "Court's regularly designate as an unlawful fine any effort of an employer to transfer to its employees the cost of doing business."[168]

All of the deductions for which Williams seeks reimbursement are in fact "an effort of an employer to transfer to its employees the cost of doing business."[169] Williams seeks to recover Flowers' deductions for warehouse rent, hand-held computer rent, shrink and stales.[170] Flowers owns the warehouse and handheld computer, both of which are an integral part of its fresh daily bread sales system.[171] These warehouses and handheld computers are also used by all Flowers other employees, including other admitted deliverymen-employees who are not charged for their use. "Shrink" is used to denote lost sales from Flowers' "pay by scan" system for bread which was scanned into the customer's account but deemed unsold because it was never again scanned at the point of sale. "Stales" denotes bread that is required by Flowers to be removed from shelves if unsold by a certain date. None of these charges or deductions reflect willful or negligent damage to Flowers. All of them result from Flowers control and direction of the details of Williams' performance and represent Flowers' attempt to transfer its cost of doing business.

Moreover, defendants "cannot rely on contract terms in direct violation of Louisiana Law", to reimburse for costs "that significantly benefited the employer and for which employees had no choice in order to keep their employment." Such provisions are "manifestly unreasonable and against public

---

[167] Exhibit 15, internal Exhibit 1, p. 36, ¶¶ 109-110.
[168] *Norman et al*, Louisiana Employment Law 2023 Edition §4:42 at p. 354.
[169] *Id.*
[170] Rec. Doc. 001 para. 171, c., 1, 2, 3, 4.
[171] Exhibit 1, Declaration of Solomon Williams, para. 32 through 36; Rec. Doc. 001, para. 168 through 173.

policy" and must "give way to the protection warranted former employees under La. R.S. 23:613 *et seq.*" Flowers' reliance on an "agreement that is void as against public policy" is misplaced.[172] These deductions cannot be justified by contract because they are a "*de facto* forfeiture of wages…in violation of La. R.S. 23:634" and "against public policy."[173]

Additionally, even if the deductions were not a fine, they were still illegal deductions under La. R.S. 23:635, or illegal forfeitures under La. R.S. 23:634, because defendant has offered no evidence which establishes that Williams "willfully or negligently damaged or broke goods, works or property of Flowers" or its customers.[174]

Williams' declaration shows that he was discharged by a ten day notice as an at will employee, under both federal and state law. If either claim is sustained "it is against public policy to take a setoff unless the setoff is for specific filings such as loans, damages caused by an employee, lost equipment, uniforms, over-payment from a previous paycheck, or property that is being improperly retained by the employee."[175]

Flowers has the burden of proof to show that these deductions were not illegal.[176] Williams asserts that they are fines or illegal deductions because they were not due to any willful or negligent damage to Flowers or its goods or works,[177] and were required by Flowers for its own benefit rather than his, and that he had no choice in order to keep his employment. The basis for these deductions is at worst a contested issue of fact which may not be concluded by summary judgment but at the trial on the merits.

---

[172] *Newsom v. Global Data Systems, Inc.,* 107 So. 3d 781, 788-789 (La. App. 3rd 2021).
[173] *Gall v. Greenpath International*, 334 So. 2d. 399, 410 (La. App 4th Cir. 2021).
[174] *Glover v. Diving Services International, Inc*., 577 So. 2d 1103 at 1108. (La. App 1st Cir. 1991); *See also, Beard v. Summit Institute of Pulmonary Medicine,* 707 So. 2d 1238 (La. 1998) at 1237.
[175] *Leprettre v. RCS, LLC,* 206 So. 3rd 1215, 1219 (La. App. 3rd Cir., 2016).
[176] *See, Batiansila v. Advanced Cardiovascular Systems, Inc*. 952 F 2d 893, 897 (5th Cir. 1992).
[177] Exhibit 1, Declaration of Solomon Williams, para. 32 through 36; Rec. Doc. 001, para. 168 through 173.

### ii.  Williams' LWPA Fine Claims Are Not Time Barred.

The nature of the cause of action determines the applicable prescriptive period.[178] Claims under the Louisiana Wage Payment Act are subject to a three-year liberative prescriptive period.  Prescription begins to run on a claim under the Louisiana Wage Payment Act at the time the wages are earned, and payment is due.[179] Notice to Flowers of legal proceedings on wage claims interrupts prescription.[180] Interruption occurs when an obligee commences action against an obligor in a court of competent jurisdiction and venue.[181] Interruption continues as long as the suit is pending and begins to run anew from the last day of the interruption.[182]

In this case, deliverymen filed a ***collective action*** against Flowers on October 21, 2015.[183]  A collective action requires putative class members (obligees) to opt-in and actively engage in pursuing their claims against Flowers (obligors).[184] Williams opted into the collective action on February 23, 2018, and has participated actively in the lawsuit ever since.[185] Prescription on Williams' wage claims were interrupted the date Williams opted-in to the wage claim lawsuit for which Flowers had already received notice. Williams opted-in within the three-year prescriptive period from the termination of his employment.

*Quinn*[186] and La. C.C.P. art. 596 are inapplicable here, because they only contemplate "class actions", not "collective actions." Conversely, an opt-*out* case and ***class action,*** like in *Quinn* and La. C.C.P. art. 596, automatically includes all putative class members, unless such persons opt-*out*.  Class actions do not require putative class members to actively engage in the pursuit of their claims but

---

[178] *McCall v. La Rt of Way,* (La.App. 3Cir. 12/16/20), 310 So. 3d 248, 251.
[179] La. C.C. art. 3494; La CC art. 3495; *Newton v. St. Tammany Fire*, 318 So.3d 206, (La.App. 1 Cir. 2/19/21); *McCall,* 310 So.3d 248.
[180] *Montiville*, 592 So.2d 390; *Parker v. Southern*, 590 So.2d 55; *Nini v. Sanford*, 276 So.2d 262 (La.1973).
[181] LSA-R.S. 33:2211 et seq.; LSA-C.C. arts. 3462, 3463, 3466, 3494, 3495; *Montiville*, 592 So. 2d 390 (La. 1992).
[182] La CC arts. 3463; 3466; *Montiville*, 592 So. 2d 390 (La. 1992); *Louviere* 440 So.2d 93 (La.1983).
[183] *Richard,* docket number 15-cv-2557 [Rec. Doc. 001-0].
[184] "The existence of a collective action depends upon the affirmative participation of opt-in Williams." *Smith v. T–Mobile*, 570 F.3d 1119, 1121 (9th Cir. 2009); *Morgan v. Family Dollar*, 551 F.3d 1233, 1259 (11th Cir. 2008).
[185] *Richard,* docket number 15-cv-2557
[186] *Quinn v. Louisiana Citizens Property Ins. Corp.,* 118 So. 3d 1011, 1020 (La. 2012)

permits passive participation. The *Quinn* court considered whether putative class members had "opted *out*" of the class action by applying the plain language of the La. C.C. art. 596. The *Quinn* analysis is inapplicable here, because Williams **opted-in** to the collective action to pursue his claims against Flowers interrupting prescription. This Court denied the certification of the collective action on October 18, 2021[187] at which time prescription began to run anew. A new three-year prescriptive period ran from the date of the denial.[188] Williams timely filed the instant suit on October 11, 2021.[189]

     *Quinn* has also been repeatedly distinguished.[190] In *Smith v. Transp. Servs. Co. of Illinois*, 2013-2788 (La. 7/1/14), 148 So. 3d 903, the Louisiana Supreme Court distinguished its holding in *Quinn* from the *Smith* facts placed before it, namely a class action removed to federal court. The Louisiana Supreme Court held that the removed action suspended prescription and noted that La. C.C. art. 596 "is a special provision...to prevent prescription from accruing against...a putative class action until...**the member's participation in the class action is determined.**"[191] The Louisiana Supreme Court's discussion of La. C.C. art. 596 confirms its inapplicability, because Williams' "participation in the class action" does not need to be determined in this case; Williams *opted-in* and actively participated in both the collective action and the filing and prosecution of this case. There is no issue participation in the collective action as there was in the class action described by *Quinn* and La. C.C. art. 596.

     The *Smith* court points out that, by affirming the exception of prescription, the Court of Appeal "misplaced" its reliance on *Quinn. Smith* highlights that courts must take heed of the "unique features

---

[187] *Richard,* docket number 15-cv-2557 [Rec. Doc. 441].

[188] *Montiville*, 592 So. 2d 390 (La. 1992).

[189] [Rec. Doc. 001].

[190] See, *Castillo v. St. Croix Basic Servs., Inc.,* 72 V.I. 528, 533, 2020 VI SUPER 35, para. 1, a Virgin Islands court declined to extend *Quinn* due to its focus on "opting out". *Castillo* noted that "filing an individual lawsuit . . . *is not an avenue for 'opting out of' or requesting exclusion from a class'"*; See also, *Harney v. Louisiana Citizens Prop. Ins. Co*., 12-177 (La. App. 5 Cir. 11/27/12), 106 So. 3d 193, distinguishing *Quinn* by applying the well settlement principle that "each pleading should be construed so as to do *substantial justice*."; *Harrison v. Horace Mann Ins. Co*., (La. App. 5 Cir. 4/10/13), 112 So. 3d 1054, 1058, the Louisiana Fifth Circuit Court of Appeal distinguished *Quinn* by relying on the plain language of La. C.C. art. 596 on opting-out for the recommencement of prescription.

[191] *Smith* at 907 (citing *Duckworth v. Louisiana Farm Bureau Mut.*, p. 14 (La.11/2/12), 125 So.3d 1057, 1065.).

of Article 596."[192] "Above all our decision in *Quinn* was confined to the plain language of Article 596" and "our conclusion [in *Smith]* must likewise be anchored" thereto.[193] When confining the analysis of whether La. C.C. art. 596 is applicable here to the plain language of Article 596 – the inapplicability is glaring.  Louisiana civil code article 596 contemplates actions with "opt-out" procedures *only.* This action is a collective action requiring "opt-in" procedures, which renders La. C.C. art. 596 wholly inapplicable.

On the face of the Complaint, Williams' LWPA claims are not prescribed. Flowers has not been prejudiced by Williams' claims as "stale" from which prescription statutes seek to protect defendants.[194] Flowers was not caught unawares by Williams' claims in the instant suit when it has been on notice of Williams claims since February 23, 2018. A finding that Williams' claims are timely is *consistent* with *Quinn* and *Smith,* which placed specific focus on the plain language of La. C.C. art. 596; plain language that addresses **class actions,** not **collective actions** like the predecessor collective into which Williams opted in.

### III.    CONCLUSION

For the foregoing reasons, Solomon Williams respectfully requests that Defendants' Motion for Summary Judgment be DENIED.

---

[192] *Smith* at 908-909.
[193] *Smith* at 908-909.
[194] *Montiville*, 592 So. 2d 390 (La. 1992); *Giroir* 475 So.2d 1040 (La.1985).

Respectfully submitted,


/s/ Steven G. Durio
STEVEN G. DURIO (#05230)
D. PATRICK KEATING (#14417)
RANDY M. GUIDRY (#26909)
LAUREN ASHLEY NOEL (#37243)
**Durio, McGoffin, Stagg & Guidry**
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, LA   70505-1308
Phone: (337) 233-0300
Fax:    (337) 233-0694
Email:  durio@dmsfirm.com
           rick@dmsfirm.com
           randy@dmsfirm.com
           lauren@dmsfirm.com


TRAVIS J. BROUSSARD (#33036)
130 South Audubon Boulevard, Suite 109
Post Office Box 82238
Lafayette, LA 70598-2238
Phone: (337) 316-8135
Fax:    (337) 233-9095
Email: travis.broussard@live.com

RYAN M. GOUDELOCKE (#30525)
130 South Audubon Blvd., Suite 105
Lafayette, LA   70503
Phone:  (337) 345-1985
Fax:     (337) 233-9095
Email:  ryan@goudelocke.law


THOMAS M. HAYES, IV (#28600)
**Hayes, Harkey, Smith & Cascio, L.L.P.**
2811 Kilpatrick Boulevard (71201)
Post Office Box 8032
Monroe, LA 71211-8032
Phone:  (318) 387-2422
Fax:     (318) 388-5809
Email:  tommy@hhsclaw.com


**ATTORNEYS FOR PLAINTIFF,
SOLOMON WILLIAMS**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of **SOLOMON WILLIAMS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system which sent a notice of electronic filing to counsel as indicated by the Court.

Lafayette, Louisiana, this 15th day of February, 2023.


           /s/ Steven G. Durio
           STEVEN G. DURIO